UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

TIMOTHY GUVERCIN,

                Defendant.

------------------------------------X

10 Cr. 1206-01(RWS)

SENTENCING OPINION

**Sweet, D.J.**

       On October 9, 2012, Timothy Guvercin ("Guvercin" or "Defendant") pled guilty to nine-count indictment 10 Cr. 1206. For the reasons set forth below, Guvercin will be sentenced to 60 months' imprisonment to be followed by no supervised release. Defendant will forfeit to the United States all property involved in the offense or traceable to it, pursuant to 18 U.S.C. § 982(a)(2) and 18 U.S.C. § 982. Guvercin will also be required to pay a special assessment of $200.

**Prior Proceedings**

       Nine-count Indictment 10 CR 1206 (RWS) was filed in the Southern District of New York.

1

Count 1 charged that from at least January 2010 through August 2010, in the Southern District of New York and elsewhere, Guvercin, a/k/a "Tim Quade," a/k/a "Douglas Quade," and others conspired to commit bank fraud, in violation of 18 U.S.C. § 1344, and wire fraud, in violation of 18 U.S.C. § 1343.

Count 2 charged that from at least January 2010 through August 2010, in the Southern District of New York and elsewhere, Guvercin acted as a lookout and coordinated fraudulent withdrawals while others withdrew cash from accounts that were not their own at Citibank branches in New York, New York, using fraudulently-obtained access devices.

Count 3 charged that charged that from at least January 2010 through August 2010, in the Southern District of New York and elsewhere, Guvercin acted as a lookout and coordinated fraudulent withdrawals while others withdrew cash from accounts that were not their own at Citibank branches in New York, New York, using fraudulently-obtained access devices that were transmitted to them via electronic mail, text message, and telephone.

2

Count 4 charged that from at least January 2010 through August 2010, in the Southern District of New York and elsewhere, Guvercin and others conspired to: possess fifteen and more devices which were counterfeit and unauthorized access devices; produce, traffic in, have control and custody of, and possess device-making equipment; and effect transactions, with one and more access devices issued to another person and persons, to receive payment and other things of value during a one-year period, the aggregate value of which was equal to and greater than $1,000, in violation of 18 USC 1029(a).

Count 5 charged that from at least January 2010 through August 2010, in the Southern District of New York and elsewhere, Guvercin and others possessed fifteen and more access devices, which they obtained with intent to defraud, and which members of the conspiracy had stolen and transmitted to them.

Count 6 charged that from at least January 2010 through August 2010, in the Southern District of New York and elsewhere, Guvercin and others had control and custody of, and possessed, equipment to make counterfeit access devices using fraudulently obtained access devices.

3

Count 7 charged that from at least January 2010 through August 2010, in the Southern District of New York and elsewhere, Guvercin acted as a lookout and coordinated fraudulent withdrawals while others withdrew more than $1,000 in cash from accounts that were not their own at Citibank branches in New York, New York, using fraudulently-obtained access devices.

Count 8 charged that from at least January 2010 through August 2010, in the Southern District of New York and elsewhere, Guvercin and others conspired to commit international money laundering, in violation of 18 USC 1956(a)(2)(B)(i).

Count 9 charged that from at least January 2010 through August 2010, in the Southern District of New York and elsewhere, Guvercin possessed, used, and transferred without lawful authority account numbers and associated personal identification numbers of other people to fraudulently withdraw money from those people's bank accounts.

On August 16, 2012, Guvercin allocuted to his criminal conduct as charged in Counts 4 and 9 only, before the Honorable Andrew J. Peck. His guilty plea was accepted by the Honorable

Robert W. Sweet on October 9, 2012.

Guvercin's sentencing is currently scheduled for February 11, 2013.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Guidelines.  Thus, the sentence to be imposed here is the result of a consideration of:

    (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)  the need for the sentence imposed —

        (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)  to afford adequate deterrence to criminal conduct;

        (C)  to protect the public from further crimes of the defendant; and

        (D)  to provide the defendant with needed educational or vocational training, medical

                    care, or other correctional treatment in the
                    most effective manner;

       (3)   the kinds of sentences available;

       (4)   the kinds of sentence and the sentencing range
             established for —

             (A)   the applicable category of offense committed
                   by the applicable category of defendant as
                   set forth in the guidelines . . .;

       (5)   any pertinent policy statement . . . [issued
             by the Sentencing Commission];

       (6)   the need to avoid unwarranted sentence
             disparities among defendants with similar
             records who have been found guilty of
             similar conduct; and

       (7)   the need to provide restitution to any victims of
             the offense.

18 U.S.C. § 3553(a).  A sentencing judge is permitted to find

all the facts appropriate for determining a sentence, whether

that sentence is a so-called Guidelines sentence or not.  See

Crosby, 397 F.3d at 114-15.


**The Defendant**


          The Court adopts the facts set forth in the

Presentence Investigation Report ("PSR") with respect to

Guvercin's personal and family history.  The Court notes that

the Defendant is a citizen of the United Kingdom, and is an

illegal alien in the United States.

**The Offense Conduct**

The following description draws from the PSR.  The
specific facts of the underlying conduct are adopted as set
forth in that report.

The United States Secret Service, in conjunction with
law enforcement authorities in the United Kingdom and the
Netherlands, conducted an investigation concerning a global
credit card fraud ring involving dozens of identified co-
conspirators.

From at least 2007 through at least July 2011, the
targets of the investigation participated in an international
criminal organization responsible for installing particularly
technologically sophisticated "skimmers" into point-of-sale
credit/debit card readers (known as PIN Entry Devices or
"PEDs"), principally in the United Kingdom and other parts of
Europe. These skimmers stole the account information of any
customer who used the compromised PED, and sent that information
to the organizers of the conspiracy, who used it to produce

7

counterfeit ATM cards. Those ATM cards were then used to withdraw cash from the compromised accounts at bank branches throughout the world, including in New York City.

The technology used by the conspirators evolved over the course of time. By 2008, the group began installing Groupe Spécial Mobile ("GSM") devices – essentially, the inner workings a cell phone – into the PEDs, which allowed them to transmit the stolen account information anyplace in the world via SMS text messages. Having perfected the technology, the group began mass-producing the devices: legitimate electronics and software companies were contracted to manufacture the component parts, and illicit factories were set up in London to install them in stolen card readers.  The data was then disseminated throughout the world to local groups that manufactured counterfeit cards, withdrew cash from banks and ATMs, and laundered the proceeds of the fraud back to Europe, Pakistan, and Dubai, primarily through hawala banks and money exchangers. From time to time, key members of the conspiracy – the people in charge of the data-interception side of the fraud –  were dispatched to oversee the cash collection or transfers, or did so from abroad utilizing Pakistan and Dubai-based "call centers" to coordinate the cash-out activity.

8

In early 2009, law enforcement in the United Kingdom raided two locations - one used as a factory to manufacture compromised PEDs, and another as a warehouse to store them - and recovered almost 1,000 devices.

In March 2010, agents from the Politie Amsterdam-Amstelland in the Netherlands ("Amsterdam Police") arrested a co-conspirator. A search incident to arrest revealed a micro SD memory card that contained, among other things, 186,000 unique card numbers with their associated PINs. (These 186,000 card numbers were derived from approximately nine compromised PEDs, operating for approximately one to two months each.).

In late 2009, agents from the United States Secret Service interviewed personnel and received documents maintained by a secure File Transfer Protocol ("FTP") site housed in or around San Francisco, California, which received approximately 349,000 SMS messages from card readers compromised by this group, representing another approximately 349,000 stolen accounts.

The conspiracy was active worldwide. Card readers were

9

compromised at least in England, Sweden, Norway, Ireland, and the Netherlands, and reportedly in Germany, Denmark, Switzerland, Norway, and Australia, as well. Stolen card data was used to withdraw cash from ATMs in the UK, Canada, the Netherlands, Germany, Italy, Norway, Sweden, Nepal, Pakistan, Dubai, the Dominican Republic, and the United States, among other places. In two days in March 2010 alone, members of the conspiracy withdrew at least $250,000 from banks in New York City. That was a test run. The following weekend alone, they were planning to withdraw more than £3,000,000.

On January 24, 2010, known members of the conspiracy stole an electronic access card reader from a "Vero Moda" clothing store located at Kalverstraat 171, Amsterdam, the Netherlands, and returned it the following day. Amsterdam Police officials recovered that device from the Vero Moda store, and determined that it had been altered through the addition of a GSM module, which had been soldered into the device. (The Vero Moda skimmer provided some of the 186,000 card numbers recovered from the micro SD card described above.)

In March 2010, members of the conspiracy traveled to New York from the United Kingdom in order to supervise the use

10

of the stolen data at ATMs in New York, and to coordinate the laundering of the proceeds of the fraud back to the organizers of the conspiracy. The three men who came to New York from London were received by Guvercin and his wife, Megan Hoare ("Hoare"). On March 6 and March 7, 2010, at least 1,110 transactions at approximately 95 locations in New York, New York, were made using the stolen account information seized in the Netherlands (including account information derived from the Vero Moda skimmer), in which cash was withdrawn from ATMs at various banks. Video footage from those banks reveals that Guvercin, Hoare, and the people who came from the United Kingdom were responsible for the cash-outs. Guvercin acted as a lookout while Hoare and others withdrew the cash.

As a result of these 1,110 transactions, approximately $260,000 in cash was withdrawn over a two-day period alone.

In August 2010, members of the conspiracy contacted Guvercin and Hoare again. This time, the organizers did not travel to the United States, but trusted Guvercin and Hoare to receive the stolen information in New York by themselves, and to use it at ATMs, which they did.

11

Guvercin and Hoare were arrested on September 17, 2010. Guvercin is being held accountable for a loss of more than $400,000 but not more than $1,000,000. The extent of Hoare's accountability is unknown.

Information from hundreds of thousands of accounts was stolen during the course of the instant conspiracy. The Government submitted a list of 131 banks and financial institutions that likely suffered actual losses as a result of the offense. It was noted that there may be additional victims that have not yet been identified. The actual loss amounts suffered by each institution, and the addresses where restitution should be sent, have not yet been provided.

**The Relevant Statutory Provisions**

For Counts 4, pursuant to 18 U.S.C. § 1029(b)(2), the maximum term of imprisonment is seven and a half years of imprisonment.  For Count 9, the mandatory term is 2 years, to run consecutively to the punishment imposed on Count 4 (18 U.S.C. § 1028A(a)(1) and (b).

For Count 4, if a term of imprisonment is imposed, a

12

maximum term of 3 years supervised release, pursuant to 18 U.S.C. § 3583(b)(2).  For Count 9, if a term of imprisonment is imposed, the maximum term is 1 year supervised release, pursuant to 18 U.S.C. § 3583(b)(3).  Multiple terms of supervised release run concurrently with each other, pursuant to 18 U.S.C. 3624(e).

For Count 4, pursuant to 18 U.S.C. § 3561(a)(3), Defendant is not eligible for probation, as he will be sentenced at the same time to a term of imprisonment for Count 9.  For Count 9, the Defendants is not eligible for probation because the instant offense is one for which probation has been expressly precluded by statute, pursuant to 18 U.S.C. § 3561(a)(2).

For Counts 4 and 9, the maximum fine is the greatest of $250,000, pursuant to 18 U.S.C. § 3571(b)(3), or twice the gross gain or gross loss, pursuant to 18 U.S.C. § 3571(d).

A special assessment of $100 per count, for a total of $200, is mandatory, pursuant to 18 U.S.C. § 3013.

**The Plea Agreement**

13

Pursuant to a written plea agreement, dated July 26, 2012, the defense and the Government stipulated to the following:

- The defendant admits the forfeiture allegations with respect to Count 4 of the Indictment and agrees to forfeit to the United States, pursuant to 18 U.S.C. § 982, a sum of money in United States currency representing the amount of proceeds traceable to the commission of Count 4.

- The defendant agrees to make restitution in an amount ordered by the Court in accordance with 18 U.S.C. §§ 3663, 3663A, and 3664.

- The sentencing guideline applicable to Count 4 is 2B1.1.

- Pursuant to 2B1.1(a)(2), because access device fraud has a statutory maximum term of imprisonment of less than 20 years, the base offense level is 6.

- Pursuant to 2B1.1(b)(1)(H), an increase of 14 levels is warranted because the loss reasonably foreseeable to the defendant, including relevant conduct, was more than

14

$400,000, but not more than $1,000,000.

- Pursuant to 2B1.1(b)(10), an increase of 2 levels is
  warranted because (a) the defendant participated in
  relocating a fraudulent scheme to another jurisdiction to
  evade law enforcement or regulatory officials, *and* (b) a
  substantial part of the fraudulent scheme was committed
  from outside the United States; and (c) the offense
  otherwise involved sophisticated means.


- Pursuant to 2B1.1(b)(11), an increase of 2 levels is
  warranted because the offense involved (a) the possession
  or use of any (i) device-making equipment, or (ii)
  authentication feature; and (b) the production of any (i)
  unauthorized access device or counterfeit access device, or
  (ii) authentication feature.

- Assuming the defendant clearly demonstrates acceptance of
  responsibility, to the satisfaction of the Government,
  through his allocution and subsequent conduct prior to the
  imposition of sentence, a 2-level reduction will be
  warranted, pursuant to 3E1.1(a). Furthermore, assuming the

15

defendant has accepted responsibility as described in the previous sentence, an additional 1-level reduction is warranted, pursuant to 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

- The offense level for Count 4 is therefore 21.

- The sentencing guideline applicable to the offense charged in Count 9 is 2B1.6. Pursuant to that section, "the guideline sentence is the term of imprisonment required by statute," *i.e.*, two years of imprisonment, to run consecutively with the sentence imposed on Count 4.

- Based upon the information available to the Government (including representations by the defense), the defendant has no criminal history points. Because his convictions all came from the United Kingdom, they are not counted towards the defendant's criminal history, but may be the basis for an upward departure pursuant to 4A1.3 (4A1.2(h)). In accordance with the foregoing, the defendant's Criminal

16

History Category is I.

- Based upon the calculations set forth above, at offense
  level 21 and Criminal History Category I, the corresponding
  Guidelines range for Count 4 is 37 to 46 months of
  imprisonment. Pursuant to 5G1.2(a), the applicable
  guideline for Count 9 of the Indictment is calculated
  separately, and is equal to 24 months of imprisonment to
  run consecutively to the term of imprisonment imposed on
  Count 4. Thus, the Guideline sentence is computed by adding
  the appropriate Guidelines sentences for each of the two
  counts of conviction, which results in a Guidelines
  sentence of 61 to 70 months of imprisonment, with a
  mandatory minimum sentence of 24 months of imprisonment. In
  addition, after determining the Defendant's ability to pay,
  the Court may impose a fine pursuant to 5E1.2. At
  Guidelines level 21, the applicable fine range is $7,500 to
  $75,000.

- The parties agree that neither a downward nor an upward
  departure from the stipulated Guidelines range set forth
  above is warranted. The parties further agree that either
  party may seek a sentence outside of the stipulated

17

Guidelines range, based upon the factors to be considered
in imposing a sentence pursuant to 18 U.S.C. § 3553(a).

**The Guidelines**

The November 1, 2010 edition of the United States
Sentencing Commission Guidelines Manual has been used in this
case for calculation purposes, pursuant to § 1B1.11(a).  The
Court finds the following with respect to Defendant's applicable
offense level, criminal history, recognition of responsibility,
and term of imprisonment:

The guideline applicable to Count 9 (Aggravated
Identity Theft) is found in Section 2B1.6.  Pursuant to
2B1.6(a), if the defendant was convicted of violating 18 USC
1028A, the guideline sentence is the term of imprisonment
required by statute.  Therefore, Count 9 is not factored into
the guideline calculations.

The guideline applicable to Count 4 (Conspiracy to
Commit Access Device Fraud) is 2B1.1. Pursuant to 2B1.1(a)(2),
the base offense level is six.

18

The defendant is being held accountable for a loss of more than $400,000 but not more than $1,000,000. Pursuant to 2B1.1(b)(1)(H), 14 levels are added.

Six levels are added pursuant to 2B1.1(b)(2)(C), as the offense involved 250 or more victims. (Pursuant to 2B1.1 application note 4(E), in cases involving means of identification, "victim" includes any individual whose means of identification was used unlawfully or without authority.)

Two levels are added pursuant to 2B1.1(b)(10), as (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials, (B) a substantial part of the fraudulent scheme was committed from outside the United States; and (C) the offense otherwise involved sophisticated means.

Two levels are added pursuant to 2B1.1(b)(11), as the offense involved (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; and (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature.

19

Based on the Defendant's plea allocution, the Government believes that the Defendant has shown recognition of responsibility for the offense.  Because of the Defendant's timely notification of his intention to plead guilty, thus allowing the Government to allocate its resources more efficiently, and because the aforementioned base offense level is 16 or greater, pursuant to § 3E1.1(a) and (b), the offense is reduced three levels.

Accordingly, the adjusted offense level is 27.

According to the FBI and the New York State Division of Criminal Justice Services, Bureau of Identification, the defendant has no prior criminal convictions in the United States.

During his presentence interview, Guvercin related that when he was 19 or 20, he was arrested in the U.K. and charged with "drunken disorderly" or "criminal damage," for writing graffiti on a wall. He said he paid a fine. According to the plea agreement, the defendant was convicted on May 14, 2004, in Croydon Magistrates Court in the United Kingdom, of Having an

Article With Intent to Damage or Destroy Property, which
resulted in a 12-month conditional discharge. Pursuant to
4A1.2(h), sentences resulting from foreign convictions are not
counted, but may be considered under 4A1.3 (Adequacy of Criminal
History Category).

          The criminal convictions above result in a total
criminal history points of 3.  According to the sentencing table
at Chapter 5, Part A, 3 criminal history points establish a
Criminal History Category of II.

          The defendant has zero criminal history points and
therefore his Criminal History Category is I.

          Based on a total offense level of 27 and a Criminal
History Category of I, the applicable guideline range of
imprisonment is 70 to 87 months, followed by the mandatory and
consecutive term of 2 years of imprisonment on Count 9, for **a**
total range of 94 to 111 months.

          Pursuant to 5D1.1(c), the court ordinarily should not
impose a term of supervised release in a case in which
supervised release is not required by statute and the defendant

is a deportable alien who likely will be deported after imprisonment. However, if a term of supervised release is ordered, it shall be at least 1, but not more than 3 years for Count 4 (5D1.2(a)(2)) and 1 year for Count 9 (5D1.2(a)(3)).

For Count 4, pursuant to 5B1.1(b)(3), Defendant is not eligible for probation, as he will be sentenced at the same time to a term of imprisonment for Count 9.  For Count 9, the Defendants is not eligible for probation because the instant offense is one for which probation has been expressly precluded by statute, pursuant to 5B1.1(b)(2).

The applicable fine range is from $12,500 to $125,000 (5E1.2(c)(3)).  Subject to the defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release, pursuant to 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,407.78 to be used for imprisonment, a monthly cost of $286.11 for supervision, and a monthly cost of $2,180.27 for community confinement.

Pursuant to 5E1.1(a)(1), the court shall enter a

22

restitution order if such order is authorized under 18 U.S.C. §§ 3663-3664.

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103.

In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is determined that a downward departure from the Guidelines sentence is warranted in the instant case.

Under 18 U.S.C. § 3553(a)(1), the Court considers "the nature and circumstances of the offense and the history and characteristics of the defendant."  Pursuant to 18 U.S.C. § 3553

23

(2)(A), the Court weighs the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Although Defendant acted as a lookout while others withdrew funds using stolen account information, he did not have a mitigating role. He was aware of the scope of the conspiracy, and showed responsibility for his role through his plea allocution.

The Defendant reports that he is good health, but he noted that he had smoked marijuana for much of his adult life, which made him paranoid and introverted.  He related that he has not had therapy since he was a child, after the death of his sister.

The Defendant stated that he was severely depressed for an approximate six-month period after his arrest. He admittedly had thoughts of suicide, but he said he made no plans for, or attempts at, taking his own life.  He reported that he was prescribed antidepressants at the Metropolitan Correctional Center, which he took for a couple of months. The defendant explained that he stopped taking the medication because it was

24

that time, but in 2003, he started drinking heavily. He
admittedly consumed alcohol at least five days a week, until he
was intoxicated, for a nine- to twelve-month period. Afterward,
Defendant stated, he reduced his alcohol intake to six or seven
pints of beer about once a week or once every-other week; in
June 2010, however, he began drinking approximately three times
a week, and getting "very drunk." He said this behavior lasted
until his instant arrest.

Defendant stated that he first used marijuana when he
was 14.  He said he initially smoked it every couple of days,
but he did not use it at all from June to November 2009.  He
then began smoking marijuana daily, and did so until two days
before his arrest.

On his personal financial statement, dated October 3,
2012, the defendant cited no assets and no liabilities. He
currently has no income or necessary expenses, due to being
incarcerated.  Defendant admittedly never filed income tax
returns while living in the U.S.

Defendant related that he attended Carshalton College
in Carshalton, England from 2005 to 2007.  He reportedly

25

received a bachelor's degree in art and design and has stated
that he is skilled in graphic design.

For about the previous four years, Guvercin was
reportedly involved in the music business, in various
capacities. He said he worked as a sound technician, as a Web
designer for a band, doing graphic design (on tee shirts, etc.),
and touring with and promoting bands. He said he also played
bass in his own band, called 50 Caliber.

Defendant appears to have strong family ties as well
as relationships with several individuals who have written to
the Court in his support.  They describe how much the Defendant
has learned while he has been incarcerated, his regret for his
past wrongdoing, and how much he hopes to rehabilitate his life
upon release.

Although Defendant acted as a lookout while others
withdrew funds using stolen account information, he did not have
a mitigating role. He was aware of the scope of the conspiracy,
and showed responsibility for his role through his plea
allocution with the Government.

Taken into account all of the above, his young age and the fact that he will be deported to the United Kingdom upon his release, the Court finds that a downward departure from the Guidelines sentence is warranted.

**The Sentence**

For the instant offense, Guvercin will be sentenced to 36 months' imprisonment on Count 4 and 24 months' imprisonment on Count 9, for a total of 60 months' imprisonment and no supervised release.

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that the Defendant is able to pay a fine, and so the fine in this case shall be waived.

The specific restitution figure applicable to the defendant and the actual loss amounts suffered by each institution have not been provided to date. If necessary, the determination of restitution may be deferred for a maximum of 90 days after sentencing, in accordance with 18 U.S.C. §§ 3664(d)(5) and (e).

The defendant shall notify the United States Attorney for this district within 30 days of any change of mailing or residence address that occurs while any portion of the restitution remains unpaid.

The defendant admits the forfeiture allegations with respect to Count 4 of the Indictment and agrees to forfeit to the United States, pursuant to 18 U.S.C. § 982, a sum of money in United States currency representing the amount of proceeds traceable to the commission of Count 4.

A special assessment of $200, payable to the United States, is mandatory and shall be due immediately.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for February 11, 2013.

It is so ordered.

New York, NY
~~January~~ , 2013

ROBERT W. SWEET
U.S.D.J.
2 · 5 · 1 3